All right. Well, again, folks are getting reset up in the courtroom. Our final case of the morning, still morning, is 24-4108 United States v. Samuel Joseph. I think the first person we'll be hearing from is Mr. Carrico. Did I say that correctly? Yes, sir, you did. Wonderful. Take a minute to get settled and we'll hear from you when you're ready. Please support. My name is Tim Carrico and I represent Samuel Joseph, the appellant in this case. Mr. Joseph was convicted by a jury trial by multiple counts involving guns and drugs. The two convictions stem from two separate arrests, one in Charleston, West Virginia, on December 27, 2021. The second arrest in Parkersburg, West Virginia, on March 17, 2022. Prior to trial, defense counsel filed two motions to suppress relating to each of the arrests on each separate date. The district court below conducted an evidentiary hearing related to both searches or both arrests and denied the motion to suppress. So the matter went to trial. All the evidence that was seized relating to both of those incidents was admitted into evidence, namely guns and drugs, methamphetamine, fentanyl, and guns. The main issue of contention below concerned the courts. What we contend is the courts incorrect or not giving appropriate weight in its determination. First and foremost, as to the first, I'm talking about the December 27, 2021 arrest in Charleston, West Virginia, and not giving appropriate weight and or consideration or findings relating to the police officers, the Charleston police officers' refusal to use their body cams. Well, that's not illegal, is it? No, sir. There was a long time before we even had body cams. So, you know, I might reflect on their credibility a little bit, but that's about the extent of it, isn't it? I respectfully disagree to some extent, Your Honor. The court below found that really all the court stated in its findings and in its order was that it may have been wise for the officers to use the body cameras, that it may have been in violation of department policy for the Charleston Police Department, but the court didn't find and then made one sentence finding that did not find that it rose to the refusal to a constitutional magnitude, and that's basically what the court's ruling was below on it, and that was it. Now, in the case, the officers were questioned. They confirmed that there was, in fact, a body cam policy, that they were required to wear body cams in connection with any interactions with the public, and the policy, the Charleston police policy that was cited in the briefs to the court, is that preservation will preserve factual regulations of officer-citizen interactions, and Detective Johnson, who was handling this, the lead investigator on the December 27 arrest, was aware of that policy, was questioned about it, and his response was he didn't use his body cams. They didn't use the body cams. The other officer acting with, again, can I just, what is the legal relevance of any of this, right? The Supreme Court has squarely held, unless you can correct me if I'm wrong, but the Supreme Court has squarely held that violating policy, or even violating state law, does not violate the Fourth Amendment, right? Yes, sir. So the only question that this relates to is whether the district court should have disbelieved the officers as a matter of credibility, right? Yes, sir. And that is a topic that is reviewed for clear error on appeal, right? Yes, sir. And so what you're sort of doing here is an argument that goes to the jury. You say, ladies and gentlemen of the jury, if these guys are so spotless in their conduct, why didn't they turn their camera on? That's probably how you argued it, pretty much, isn't it? Well, actually, I was trial counsel. There was previous counsel. Well, that's probably how, that's how I would argue. Yes, sir. That is correct, but when you go to, after these decisions are made, all this evidence is in front of the jury, it really doesn't matter. Well, look, you tell the jury they should disbelieve when the officers testify to what happened. You tell the jury maybe that's what happened, but if they're telling the truth, why is there no body cam footage? Maybe you shouldn't believe them when they testify to what happened. Well, when the evidence is introduced in front of the jury that when Mr. Joseph was apprehended on December 27th and then he's arrested, he's cuffed, then the bag's seized, then they get a warrant for the bag, they go into the bag, the methamphetamine and guns are found in the bag, and that's presented in front of the jury, it's open and shut at that point in time. So can I ask you a question? Go ahead. I'm going to switch topics. No, you go ahead. Okay. So can I ask you about the abandonment issue? Because for the life of me, I can't figure out why the abandonment issue matters in this case, and I'd like you to help me try to figure that out. Like whether he abandoned or not. So, sorry, let me give you the hypothesis for why the abandonment doesn't matter. So I don't think there's any Fourth Amendment seizure in this case of any sort until your client stops running and is apprehended by the police, right? Yes, sir. Okay. So, and that's long after he's, quote, abandoned the bag, right? Or abandoned or not, the dropping the bag has happened by the point that has happened, right? That is a disagreement between Mr. Joseph and – Let me rephrase. As the district court found the facts, that's already happened. Okay. The court found that specifically it determined that Officer Clendenin's testimony was more credible than Mr. Joseph's. Okay. So at the point that happens, it seems blindingly obvious to me that there is reasonable suspicion of unlawful conduct because we have got A, the tip, B, the officer seeing with his own eyes drug material, and three, your client's unprovoked flight, which seems highly relevant under HODAR ID. So it seems at that point it is clear there is at least justification for a Terry stop at that point, at which point we can keep him until the drug dog shows up. The drug dog shows up. The drug dog sniffs drugs, at which point there is now probable cause the bag contains drugs. Notice how I haven't said the word abandoned at any point. I just don't see why there's any abandonment issue in this case at all. I believe the argument, Your Honor, would be that at the time, based on the evidence in the case, the officers did not have reasonable articulable suspicion. But when you discuss this point in your brief, you ignore the flight, and the flight under HODAR ID is deeply relevant, isn't it? Yes, sir. The flight is deeply relevant. Mr. Joseph admitted in his own testimony when he was initially confronted by Officer Glendennan, as Officer Glendennan stated, he didn't know why, but he took off running. He took off running, right. And he says, and he- And so that plus the officer's personal observations plus the tip seems obviously reasonable suspicion to me. Well, as to the personal observations, the officer, they conducted surveillance commencing at 12 o'clock that day, so Officer Johnson conducted approximately 10 hours of surveillance on- I looked through the window of the room, and I saw drug material that is not disputed to have been drug material, and in all that time, one person went in or out of the room, and it was your client, right? Yes, sir. How is that not reasonable suspicion of drug activity? I believe the argument below is that we have the officers themselves, serious credibility issues because they didn't use their body cams. There was no evidence that the body cams did not work. There was no evidence that they were not available, and frankly, Johnson admitted it was available. They just did not use them. It wasn't that the policy wasn't mandatory, that there was a question on that. They didn't use, and you couple that, and then Johnson's asked why, okay, you actually saw. Secondly, he didn't, from the record, he did not, when he did the knock and talk at 4.30 p.m., when he planned to do the knock and talk, he didn't have a body cam. He intended to do that without the body cam, even though he confirmed in his testimony that he didn't have to, because Mr. Johnson or Mr. Samuel Joseph didn't answer the door, he wasn't there, he didn't have to have, didn't use the body cam, but he also was asked questions. Why didn't he take pictures of the alleged paper folders, digital scale, and baggies that he purportedly saw? He didn't do it. He's asked, he just didn't do it. Then after that, he did see Mr. Joseph dropped off at the hotel at approximately, I believe, 8.30 p.m., and at that time, he followed the vehicle that dropped him off, and it turned out were two females. They stopped the vehicle. He did a full-blown search of their vehicle, and secondly, he didn't, this is the second contention of violating officer or CBD policy, he did not use a body camera in connection with those conversations with those two females, but he did not find drugs. They were not under the influence of drugs or alcohol. They did not implicate Mr. Joseph in connection with any drug trafficking whatsoever at all, other than stating that he paid $10 for the drive, he lied to them, because they told one of the females, told the police officer, or told Johnson, that they dropped him off at McDonald's, and the officer knew that was incorrect, and that it was an out-of-town dude. Are there any facts in the record who this driver was? It's just sort of glaringly weird when you read the briefs and read the district record, like someone gave him a ride and we questioned her, but no additional information about who that is. I believe her name is in the record, if I'm correct. Her name is actually in the record below from what I've seen. This is not an Uber or Lyft driver or a taxi or something like that, at least according to anything I read, right? No, sir, there's no other information that he allegedly spoke to this person and he did not activate the camera, which he knew was his policy. And that's the issue when you have these sorts of arrests, a reasonable suspicion, a Terry stop, they have the body cams available, it would answer a lot of these questions. I know that per se it's not unlawful, but if it is coupled with bad faith and— Well, what's the evidence of bad faith here? I mean, what you're sort of doing is arguing to us what your predecessor probably did to the jury. You know, here's a guy that's over at McDonald's doing all this illegal stuff. Why isn't there any film from the McDonald's cams about this? Why isn't there any body cam from the police officers? Now you're going to believe these guys? That's sort of—you're making a jury argument to us on this. Yes, sir. Actually, I ended up having to try the case below, and I did something I've never done before. With all the evidence coming in, knowing that's all coming in, and Mr. Joseph would not sign a—he didn't want to sign a conditional plea agreement and was concerned about waiving any interest. So we tried it, and I didn't contest. First time I've ever done that. Very uncomfortable doing that. Did not contest it, so he still got acceptance of responsibility. I didn't say—he got a 270-month sentence. It was a sentence from the court. But with all that overwhelming evidence coming in, all these questions to make in front of a jury really didn't matter anymore. Can I ask you one last question about December because I have a question about March? Yes, sir. Is there anything in the record about how much time passes between when the defendant is handcuffed and when the drug dog alerts? Is there anything in the record of what the duration of that period is? No, sir. No specific on the time period other than the officer explaining, Johnson explaining, and Clendenin explaining what had happened. But it is—I believe it's in the record that the dog was already there, right? They didn't have him handcuffed in this parking lot and wait for a dog to show up. Yes, sir. That is correct. The officer Clendenin who arrested Mr. Joseph had the dog. He was a patrolman. He was not an interdiction officer, I believe, such as Mr. Johnson was. Can I move you to March then? Yes, sir. What do I do about the fact that the district court specifically found the stop was not extended to wait for the dog? Actually, Your Honor— Judge, it's fine. From looking at the record and going through the tapes, it appears that the officer extended, prolonged the stop by his unrelated investigation by three minutes. And my understanding from reading the Rodriguez decision, the issue is not really—the issue is did, in fact, the unrelated investigation acts prolong it? The arrest was at 11.05—strike that— 11.01 a.m. in the morning and 51 seconds. That's when the initial stop was made. At 11.03.46, Officer Snyder calls in and asks for a K-9. He does not ask for—he does not provide the request for a warrant driver information because the driver in that case didn't have a driver's license. So he's not extending the stop at that point. He can't call in a license if he doesn't have the license. No, sir. At 11.03, he had the license number. He was at the car at 11.03. He had already had the license number and that information. Rather than calling that in to dispatch, he called in for the K-9 first. Now, Officer Snyder testifies he doesn't remember whether he was back at his car yet when he called in for the K-9 or whether he was walking to his car. But as a result of that, he did not actually call in to dispatch that information to determine whether there were warrants and whether he was a legal driver or had a legal license until 11.05.28. That's a minute and 42 seconds. Okay, but you said the following happens. He goes to the driver. He gets the license. As he's walking back to the car to call in the license, he just squawks his radio and says, get us a K-9. He doesn't break stride. He's still walking. He says, get a K-9. He walks back to the car. He then calls in the license. You wouldn't say then he's extended the stop to call the K-9, right? Because he's going to have to walk back to the car either way. If he walks and talks at the same time, that's not the same. Correct, sir, but that's at 11.03.46, and he doesn't call dispatch until 11.05.28, a minute and 42 seconds later. But what do I do with the district court finding that he called in the K-9 while he was beginning to fill out the citation? That's what the district court found happened. The evidence is at 11.05.28. So we would say the district court was clearly erroneous when it found that? Yes, sir. Okay. At 11.14.09, this is eight minutes and 19 seconds later, at 11.14.09, dispatch tries to get in touch with Officer Snyder to say they got the information. No warrants, which is going to dispel reasonable suspicion, and also the driver, Mr. Williams, has a valid license. So dispatch tries to call him at 11.14.09. He doesn't answer. Now, it appears from the record what he's doing, he's talking to Officer Morris who works for Metro Drug Unit in Charleston who tells him at that point in time that Mr. Joseph is a drug distributor and he's aware in Charleston. That's it. But the argument is that extended it not until 11.15 because he didn't take the call. He didn't get the information from dispatch until 11.15.30, and then when he gets the information back from dispatch, he walks to the car to give the ticket, and then he says at the same time that's when the dog canine person arrived. So the argument is that it was extended by three minutes. Wait, the three minutes? There was one minute when he got the information and then he went back to the car. Where is the extension? Well, he should have called. We contend that he should have called dispatch at 11.03.46. That should have been the first thing he had done, just called. And as a result, he didn't do that. He called for the canine and didn't call in until 11.05. The next extension is, it appears from the record, he's on the phone with Morris talking to Morris about the unrelated investigation rather than taking the call from dispatch at 11.14.09, which is telling him, excuse me, Your Honor, I believe I'm out of time. No, feel free. So rather than taking that call, he's talking to Morris conducting his unrelated investigation. That was when they called in the information for him to write the ticket, and then he was on the phone with the other guy, and he actually got the information a minute later. And what about the third party that comes up to the car? Isn't that enough of a reason for the delay? Well, it's not clear from the record when that actually happened. I think from the record the only reasonable time that could have happened is after he – that occurred after he had already called in the information at 11.05.28. When he called in, all this stuff happened because he was waiting. He did wait for the information back from dispatch. And it appears, based on the timing and the testimony, that had to happen after 11.05. So after 11.05.28, that's when, I believe, they would have dealt with the third party who came up to the car, and secondly, he got on the phone with Morris. But he gets a call back, no question, he didn't take it from dispatch, and they had that information. And then he gets off the phone with Morris. Thank you, Mr. Carrico. You'll have some time in rebuttal.  Mr. Wolfe, we'll hear from you. Thank you, Your Honor. I'm not sure it's going to matter, but your time was starting at 19.  Very good. You can go ahead and start. We'll get it fixed. Thank you, Your Honor. And may it please the court, good afternoon. I believe it's afternoon by now. Four minutes. My name's Jeremy Wolfe. I'm here representing the United States in this case. Talking first about the December 2021 incident, the district court held a suppression hearing relative to that Terry stop and arrest. And during that suppression hearing, the two officers involved, Johnson and Clendenin, testified. The defendant himself testified. All those witnesses were subject to full cross-examination. The district court had the opportunity to hear each witness' testimony and observe their demeanor as they testified, which, of course, is an important aspect of a credibility determination that, unfortunately, doesn't make its way into a transcript, doesn't make its way into the record on appeal. Nevertheless, after that hearing, and based on the testimony and the evidence and observing the witnesses during the hearing, the district court found that the officers were more credible than the defendant. Can I still ask you the question? Are there any facts in the record about this driver? It's just bothering the heck out of me to not have any idea who this person is or what the circumstances are. Yes, Your Honor. Well, we got into it a little bit more at trial, but, of course, that didn't end up in the record on appeal in this case. But the driver, she was identified. She was not an Uber, as the court was asking Mr. Carrico earlier. She was a private citizen. And this didn't find its way into the record either, but she was interviewed later on by Detective Johnson, and she actually admitted that she was driving him around for drugs. So can I ask you, do you have any quarrel with the proposition that the fact that there was a policy that required them to turn on their body cams and they didn't is relevant information for the district court to consider? Relevant or irrelevant, Your Honor?  I believe it may have some relevance if there's a pattern of violations intentionally failing to follow the policy. I'm not saying it's dispositive. I'm just asking if you have any quarrel with the proposition that it's irrelevant. No, Your Honor, I don't.  And that it could be used to, like, I guess I'll say it. If the district court had made an adverse credibility finding to the officers, would it have been improper for the district court to rely in part on the fact they were wearing body cameras, they were supposed to turn them on, and they didn't? The simple fact of that, no, Your Honor. No, what? As in the district court could not have relied on that fact? I would not have had a quarrel with that. Okay, okay. Thank you. I'm sorry, Your Honor. No problem. But I think, of course, the devil's in the details. Part of the testimony the district court heard during that suppression hearing was Detective Johnson's explanation as to why he didn't have his body cam on, why he didn't activate the body cam, and the court obviously, of course, the district court was entitled to credit that and apparently did credit that. Remind me again what his explanation for that was? So there was only really one policy violation in play in this case, and that would have been Detective Johnson's failure, admitted failure, to take the body camera from the charging port in his vehicle, put it on himself when he went to approach and eventually stop and arrest the defendant. His explanation was that when he's sitting in his vehicle, he doesn't keep the body cam on. He keeps it in a charging port, and that apparently he knew he was going to get out and approach the defendant at some point, but it was a somewhat hasty decision. Oh, he's in the McDonald's. He's not coming out. We're going to jump out and do this now. He admitted that he failed to take the body cam with him, and I think he was very candid in doing that. Of course, my opinion doesn't really matter. It's the district court's opinion, but the testimony was very candid because defense counsel was somewhat unclear and expressed some doubt in his questioning as to whether Detective Johnson even fell under that body cam policy because Detective Johnson was working for a drug unit. Detective Johnson candidly corrected him and said, no, sir, I was under that policy, and I failed to take the body cam with me. And so his explanation was very candid and, of course, worthy of credit by the district court, and, of course, the district court did credit that explanation, finding the officers more credible than the defendant. I think it's interesting when it comes to the body cam issue. The only disputed matter of fact relative to this incident was whether the defendant threw down his bag during the pursuit. That's it. Everything else was either agreed to or not disputed. And can you respond to the question I asked of the other side? Why does this abandonment issue matter here at all? It really doesn't, Your Honor, because even if the defendant didn't abandon his bag, as the court noted, there was abundant reasonable suspicion to stop him, and the defendant didn't challenge a lot of things in this case. The defendant didn't challenge the length or the scope of the Terry stop. He didn't challenge the canine sniff of the duffel bag. Or that it created probable cause. Correct, Your Honor. He didn't challenge the search warrant that was issued. So his challenge was really narrowed in on whether this Terry stop was appropriate at its inception, whether there was reasonable suspicion, and obviously there was. So if you credit the defendant's version of events, if you just credit his version of events, that he held this duffel bag all the way until the end, until he surrendered, well, then it's seized right along with him, and the canine sniff happens, and the warrant issues, and we get the same evidence. So I think even if there was an error in the district court's handling of the body cam issue, even if the district court failed to appropriately assign weight to that fact in making its credibility determination, if the court, for the sake of argument, let's say the district court clearly erred in finding the officers more credible, clearly erred in finding the defendant abandoned the duffel bag, it'd be harmless error because we end up in the same place. Can I bring you to March? So your friend on the other side says that basically, I mean, I understand he's reluctant to say it, but I think their argument is the district court was just clearly erroneous in concluding the stop wasn't extended. What is your response to the account that the district court gives does not match the time on the video? That's essentially what I view, or the audio or whatever. He just says the district court's version of when things happen does not match the timeline of known events. Would you just respond to that? Well, that timeline wasn't really challenged at the suppression hearing. So I think there's indisputable evidence that the timeline was correct, and the district court found that there wasn't an extension, that Sergeant Snyder never diverted from the task necessary to issue the citation, that the citation wasn't issued by the time the canine arrived and indicated on the vehicle, that this stop took around 15 minutes total, that there were various impediments to Sergeant Snyder going through with the mission of this stop, first of all being that the driver didn't have an ID with him, second of all, the third-party mail intervening, and so there's nothing. Did the third-party mail intervene before or after the citation was written? Before, Your Honor. I think it was unclear at what point during the timeline it happened, but Sergeant Snyder testified that, of course, he was unable to work on the citation while he was dealing with the third-party mail. So he got up out of his vehicle, presumably left the citation and all the documents in the car and went to deal with this guy, and that took a couple minutes. But that happened before the citation was completed because the citation wasn't completed until after the canine indicated. And so the district court's findings on that issue were also not clearly erroneous. And going back just briefly to the first incident, Officer Clendenin was the only person other than the defendant who observed the pursuit, who could have offered firsthand testimony about the abandonment, whether it happened or whether it didn't. The defendant, counsel, never asked Officer Clendenin about whether he had a body cam on, why he didn't. The only question that was put to an officer on that issue was to Detective Johnson. Counsel asked Detective Johnson, do you recall whether Officer Clendenin was wearing a body camera? And Detective Johnson said, not that I recall. But Officer Clendenin was never asked that, so we don't know why he may have not worn it, why he didn't have it with him, why he didn't activate it. I can tell the court that I know there wasn't a body cam video from Officer Clendenin because I checked before I charged the case and there wasn't one. But that question wasn't asked, so the court never got a chance to hear his explanation as to why he may have done that or worn the body cam or why he didn't. And so it's certainly not clearly erroneous for the district court to not discount an officer's credibility based on something that he's not asked. And so based upon all this, if there are no further questions, I would ask the court to simply affirm. Thank you. Thank you, Your Honor. Mr. Carrico, you've got some time? Yes, just briefly. Your Honor, as to your point, your question relating to what is the significance or is there any significance of whether there was abandonment, I believe what's clear on the record is that the officers, once Mr. Joseph took off running and went into the other lot when he was apprehended, he was arrested for fleeing an obstruction. But he's not arrested until they, right, I don't know if that's HODAR ID, right? You're not seized until you, it's not just enough to say stop, it's not, they have to catch you, right? Yes, sir. Okay. And once Mr. Joseph started running, the officer reasonably would have had reasonable suspicion at that point in time.  He had reasonable suspicion to detain him and talk to him to dispel or confirm. However, based on the testimony of Officer Johnson, they arrested him at that point in time. He was arrested. Judge Johnston or the district court in his findings determined, well, this was really just a Terry stop, it wasn't arrest. But it was arrest and that's what Officer Johnson testified to, that he was arrested for fleeing an obstruction at that time. But hasn't the Supreme Court told me that why an officer believes they arrested someone or when they believe they arrested someone does not control when as a matter of the Fourth Amendment they arrested them? Yes, sir. The other point I would like to make is in connection with the information. The information that Mr. Moore, that relates to this arrest, would have been the information that Mr., we believe that the information that Officer Morris provided to Officer Snyder in Parkersburg. So if in fact... Sorry, I just want to make sure factually I'm tracking you. Is this the December or the March incident we're talking about right now? I'm talking about the December incident. Okay, thank you. And information relating to that arrest would have been provided by Officer Morris to Officer Snyder in Parkersburg when he was on the phone. So if the court were to find that at that moment in time one would think that arguably they would have extended the stop at that point in time once he got that information. But our argument is that came after the fact and they should have been out of there before the K-9 got there. Thank you, sir. Thank you, Mr. Carrico. Mr. Carrico, I noticed that you're court appointed. Yes, sir. The court, we thank you, especially given the context of being public defense week or month. I don't remember if it's week or month, but more so than even normal. We'd like to thank you for your work on this case, both it sounds like in the trial court in here, the criminal defense defendants rely on it, the court relies on it. We very much appreciate your work in this case. We will come down and greet counsel and then adjourn court for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Toby J. Heytens, Nicole G. Berner, John A. Gibney Jr.